**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHRISTOPHER STRIANESE, ) <br> individually and on behalf of all others ) <br> similarly situated, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GOHEALTH, INC., CLINTON P. JONES, ) <br> BRANDON M. CRUZ, TRAVIS J. ) <br> MATTHIESEN, NVX HOLDINGS, INC., ) <br> CENTERBRIDGE PARTNERS, L.P., ) <br> CCP III AIV VII HOLDINGS, L.P., ) <br> CB BLIZZARD CO-INVEST HOLDINGS, ) <br> L.P., BLIZZARD AGGREGATOR, LLC, ) <br> CENTERBRIDGE ASSOCIATES III, L.P., ) <br> CCP III CAYMAN GP LTD., ) <br> GOLDMAN SACHS & CO. LLC, ) <br> BOFA SECURITIES, INC. and ) <br> MORGAN STANLEY & CO. LLC, ) <br> ) <br> Defendants. ) | Case No.: <br><br> **CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Christopher Strianese (herein, "Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint for violations of the Securities Act of 1933 ("1933 Act"), against GoHealth, Inc. ("GoHealth" or the "Company") and the other defendants listed herein. Plaintiff makes the following allegations pursuant to the investigation of their counsel, which included among other things, a review of public filings submitted to the Securities and Exchange Commission ("SEC"), conference call transcripts, earnings reports, investor presentations, analyst and media reports, as well as other public information regarding the Company and its initial public offering, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, which are based on personal knowledge.

**NATURE OF ACTION**

1.      This is a securities class action on behalf of all purchasers of GoHealth Class A common stock pursuant and/or traceable to the registration statement issued in connection with GoHealth's July 2020 initial public offering (the "IPO"), seeking to pursue remedies under the 1933 Act against GoHealth, certain of GoHealth's officers and directors, the private equity sponsor of the IPO and its affiliates, and the IPO's underwriters.

2.      GoHealth provides an end-to-end health insurance marketplace that purportedly specializes in matching consumers with Medicare Advantage plans. Based in Chicago, Illinois, GoHealth is organized as a holding company, with GoHealth Holdings, LLC ("GHH") as the Company's principal asset, which houses Company operations. GHH was formerly known as Blizzard Parent, LLC ("Blizzard"), until it was acquired by the private equity firm Centerbridge (defined below) in September 2019 for $1.1 billion in equity and cash (the "Acquisition"). In connection with the Acquisition, Centerbridge also agreed to pay the Company's selling shareholders up to $275 million worth of additional contingent consideration, to be paid in the form of common and senior preferred earnout units, if the Company achieved certain earnings targets in late 2019 and 2020.

3.      Immediately following the Acquisition, GoHealth reported tremendous growth. From September 13, 2019 through December 31, 2019, GoHealth purportedly generated $308 million in net revenues, compared to just $231 million during the period from January 1, 2019 through September 12, 2019. Thus, GoHealth stated that it had generated substantially more revenues in the three-and-a-half months following the Acquisition than in the eight-and-a-half months preceding the Acquisition. Indeed, GoHealth claimed to have generated more revenues in

the three-and-a-half months following the Acquisition than it did during the Company's entire 2018 fiscal year.

4.     GoHealth also represented that its business model was highly profitable, offering the best life time value of commissions ("LTV") per consumer acquisition cost ("CAC") of any of its peers. LTV refers to the commission revenues that GoHealth expected to receive from insurance carriers in connection with an approved submission for an insurance policy by a new consumer over time, factoring in variables such as contracted commission rates, carrier mix, policy persistency, and the number of expected submissions. CAC refers to the cost to GoHealth of acquiring its consumers. Thus, LTV/CAC is a type of profitability metric that generally refers to how much of a return GoHealth expects on its consumer acquisition investments. GoHealth represented that its LTV/CAC ratio for its Medicare Internal segment (the Company's largest and most profitable segment) was 3.9x and 2.7x for 2019 and its first quarter 2020, respectively, significantly higher than the 1.7x LTV/CAC ratio the Company stated it had achieved during the first quarter of 2019 and, by some estimates, roughly double GoHealth's peers.

5.     Although GoHealth generated net losses in 2019, the Company claimed that this was because it was in growth mode and seeking to expand its presence as a dominant force in the Medicare insurance marketplace. The Company's adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") – a metric tailored by management ostensibly to show the Company's core profitability by excluding certain costs – increased considerably in the lead-up to the IPO. GoHealth claimed that its adjusted EBITDA had grown by 388% year over year to $170 million during its pro forma 2019 and by 394% year over year to $35 million during the first quarter of 2020. As a result of its apparently exceptional earnings growth, GoHealth

incurred $75 million in contingent consideration liability from the close of the Acquisition through the end of the first quarter of 2020 to be paid out to the Company's prior owners.

6.      Unlike many competitors, the Company focused its business on just two insurance carriers, Humana and Anthem. In the first quarter of 2020, 74% of GoHealth's entire net revenues were derived from just these two carriers. This carrier concentration was even higher for GoHealth's all-important Medicare segments at roughly 85% of all segment revenues – despite the fact that Humana and Anthem were estimated to account for just 23% of total Medicare Advantage market-wide enrollment.

7.      GoHealth considers insurance carriers to be its primary customers, rather than consumers, because the carriers are responsible for paying commissions to GoHealth in exchange for GoHealth reliably placing policies in compliance with applicable regulations and carrier-specific requirements. The Company does not receive any revenues directly from consumers. The carriers utilize GoHealth as a scalable means of acquiring customers that can be more cost effective than developing internal acquisition capabilities. According to GoHealth, the Company's high LTV/CAC ratio was primarily the result of the Company's unique competitive advantages in the services it provides to its insurance carrier partners. As described by the Company, GoHealth's "Best-in-Class Medicare LTV/CAC Ratio" is "Driven by Proprietary Technology, Business Processes, Data and Highly Skilled Agents."

8.      On June 19, 2020 – just nine months after the Acquisition – GoHealth filed with the SEC a registration statement for the IPO on Form S-1, which, after two amendments, was declared effective on July 14, 2020 (the "Registration Statement"). On July 16, 2020, GoHealth filed with the SEC a prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement. The Registration Statement was used to sell to the investing public

43.5 million shares of GoHealth Class A common stock at $21 per share, for total gross proceeds of $913.5 million. Proceeds from the IPO were used primarily for the purpose of paying Company insiders and Centerbridge and consummating financial obligations which had arisen from the Acquisition.

9.  The Registration Statement for the IPO was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation. Specifically, the Registration Statement failed to disclose that at the time of the IPO: (i) the Medicare insurance industry was undergoing a period of elevated churn, which had begun in the first half of 2020; (ii) GoHealth suffered from a higher risk of customer churn as a result of its unique business model and limited carrier base; (iii) GoHealth suffered from degradations in customer persistency and retention as a result of elevated industry churn, vulnerabilities that arose from the Company's concentrated carrier business model, and GoHealth's efforts to expand into new geographies, develop new carrier partnerships and worsening product mix; (iv) GoHealth had entered into materially less favorable revenue sharing arrangements with its external sales agents; and (v) these adverse financial and operational trends were internally projected by GoHealth to continue and worsen following the IPO.

10.  Shortly after the IPO, the price of GoHealth Class A common stock suffered significant price declines, and by September 15, 2020, GoHealth Class A common stock closed at just $12.53 per share – over 40% below the $21 per share price investors paid for the stock in the IPO less than two months previously.

**PARTIES**

11.     Plaintiff purchased GoHealth Class A common stock pursuant and/or traceable to the Registration Statement and has been damaged thereby. Plaintiff's certification is attached hereto as Exhibit A.

12.     Defendant GoHealth, Inc. operates a health insurance marketplace. The Company is headquartered in Chicago, Illinois, and its Class A common stock trades on the NASDAQ under the ticker symbol "GOCO."

13.     Defendant Clinton P. Jones ("Jones") is a co-founder of GoHealth, its Chief Executive Officer ("CEO"), and Co-Chair of GoHealth's Board of Directors (the "Board").

14.     Defendant Brandon M. Cruz ("Cruz") is a co-founder of GoHealth, its Chief Strategy Officer, a Special Advisor to the Executive Team, and Co-Chair of the Board.

15.     Defendant Travis J. Matthiesen ("Matthiesen") is GoHealth's Chief Financial Officer.

16.     The defendants identified in ¶¶13-15 above are referred to herein as the "Individual Defendants." All of the Individual Defendants signed the Registration Statement for the IPO. Each of the Individual Defendants also reviewed and helped prepare the Registration Statement and, as directors and/or executive officers of the Company, participated in the solicitation and sale of the Company's Class A common stock to investors in the IPO for their own financial benefit and the financial benefit of GoHealth.

17.     Defendant NVX Holdings, Inc. ("NVX Holdings") is a Chicago-based investment vehicle created for the benefit of defendants Cruz and Jones to house their ownership of GoHealth Class A and Class B stock. Defendant Cruz served as President of NVX Holdings and defendant Jones served as its CEO.

18.     Defendant Centerbridge Partners, L.P. ("Centerbridge Partners") is a New York-based private equity firm.

19.     Defendants CCP III AIV VII Holdings, L.P., CB Blizzard Co-Invest Holdings, L.P., and Blizzard Aggregator, LLC are investment vehicles created for the benefit of Centerbridge Partners to house its ownership of GoHealth Class A and Class B stock.

20.     Defendant Centerbridge Associates III, L.P. is the general partner of defendants CCP III AIV VII Holdings, L.P. and CB Blizzard Co-Invest Holdings, L.P.

21.     Defendant CCP III Cayman GP Ltd. is the general partner of defendant Centerbridge Associates III, L.P. and the sole manager of defendant Blizzard Aggregator, LLC.

22.     The defendants identified in ¶¶18-21 above are referred to herein as "Centerbridge." Defendant Centerbridge was a controlling shareholder and primary beneficiary of the IPO, as well as its private equity sponsor, as detailed herein.

23.     Defendants Goldman Sachs & Co. LLC, BofA Securities, Inc. and Morgan Stanley & Co. LLC (the "Underwriter Defendants") served as underwriters and lead underwriter representatives for the IPO. Together with the underwriting syndicate, they sold 43.5 million GoHealth shares in the IPO at $21 per share and shared $50.2 million in underwriting discounts and commissions. The Underwriter Defendants' failure to conduct adequate due diligence in connection with the IPO and the preparation of the Registration Statement was a substantial factor leading to the harm complained of herein.

**JURISDICTION AND VENUE**

24.     The claims alleged herein arise under §§11 and 15 of the 1933 Act [15 U.S.C. §§77k and 77o]. This Court has jurisdiction over the subject matter of this action pursuant to §22 of the 1933 Act [15 U.S.C. § 77v].

7

25.     This Court has personal jurisdiction over each of the Defendants and venue is proper in this Court because Defendants conducted the IPO in this District, drafted the offering materials in this District, disseminated the statements alleged to be false and misleading herein into this District, solicited purchasers of GoHealth common stock in this District and reside or are headquartered or have submitted to jurisdiction in this District, and those contacts have a substantial connection to the claims alleged herein.

## FACTUAL BACKGROUND

### I.     GoHealth's Business

26.     Based in Chicago, Illinois, GoHealth operates a health insurance marketplace that matches consumers with health insurance carrier plans. The Company was founded in 2001 by defendants Cruz and Jones.

27.     GoHealth maintains a proprietary technology platform designed to gather and leverage insurance behavioral data in order to better match consumers with health plans that meet their needs. The Company operates a vertically-integrated customer acquisition platform that includes omni-channel marketing efforts and trained and licensed health insurance agents. It does not receive any fees directly from consumers. Rather, the Company is paid a commission by insurance carriers for successfully enrolling consumers in the carriers' plans and additional recurring commissions so long as those consumers retain their health insurance plans.

28.     GoHealth divides its operations into four operating segments: (i) Medicare – Internal; (ii) Medicare – External; (iii) Individual and Family Plans ("IFP") and Other – Internal; and (iv) IFP and Other – External. "Internal" refers to commission revenues generated by GoHealth-employed agents, whereas "External" refers to commission revenues generated by an independent, national network of agents that use the GoHealth platform. The majority of the

Company's revenues and profits are generated in its Medicare Internal and External segments. For the first quarter of 2020, the Medicare Internal segment accounted for 68% of GoHealth's total revenues, and the Medicare External segment accounted for an additional 21% of revenues.

29.     Medicare Advantage products generate the majority of net revenues in GoHealth's Medicare segments, accounting for 75% of net revenues for its Medicare Internal segment and 95% of net revenues for its Medicare External segment during the first quarter of 2020. Somewhat uniquely among its peers, the Company generates the substantial majority of its revenues from just two carriers: Humana and Anthem. Combined, these two carriers accounted for 74% of GoHealth's total revenues for the first quarter of 2020, up from 43% of the Company's total revenues in the first quarter of 2019. The concentration was even higher in GoHealth's critical Medicare segments, in which these two carriers accounted for roughly 85% of segment revenues for the first quarter of 2020.

30.     In September 2019, GoHealth was acquired by defendant Centerbridge for $808 million in cash, $306 million in equity, and up to $275 million in contingent consideration to be paid to the selling shareholders in the event certain earnings thresholds were subsequently achieved by the Company in late 2019 and 2020.

31.     Following the Acquisition, GoHealth stated that it had achieved extraordinary growth, as Centerbridge prepared to take the Company public. From September 13, 2019 through December 31, 2019, GoHealth purportedly generated $308 million in net revenues, compared to just $231 million during the period from January 1, 2019 through September 12, 2019. As a result, GoHealth claimed to have generated 33% more revenues in the three-and-a-half month period following the Acquisition than in the eight-and-a-half month period preceding the Acquisition. GoHealth also claimed to have generated 36% more revenues in the short period at

the end of 2019 following the Acquisition than in the Company's entire 2018 fiscal year, when it generated $226 million in net revenues.

32.     GoHealth represented that its business model was highly profitable, offering the highest LTV/CAC ratio of any of its peers. GoHealth claimed that its LTV/CAC ratio for its Medicare Internal segment was 3.9x and 2.7x for 2019 and the first quarter of 2020, respectively, far higher than the 1.7x LTV/CAC ratio the Company stated it had achieved during the first quarter of 2019 and, by some estimates, roughly double GoHealth's competitors.

33.     Although GoHealth generated net losses in 2019, it represented that this was because the Company was in growth mode and seeking to expand its presence as a dominant force in the Medicare insurance marketplace. GoHealth reassured investors that its core profitability was intact and substantially increasing at the time of the IPO. For example, GoHealth claimed that its adjusted EBITDA had grown by 388% year over year to $170 million during its pro forma 2019 and by 394% year over year to $35 million during the first quarter of 2020.

34.     On June 19, 2020, GoHealth filed the Registration Statement with the SEC, which, after two amendments, was declared effective on July 14, 2020. On July 16, 2020, GoHealth filed the prospectus for the IPO with the SEC, which incorporated and formed part of the Registration Statement. The Registration Statement was used to sell 43.5 million shares of GoHealth Class A common stock to the investing public at a price of $21 per share, generating $913.5 million in gross offering proceeds.

## II.     The Materially False and Misleading Registration Statement

35.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements

10

contained therein not misleading, and failed to make necessary disclosures required under the rules and regulations governing its preparation.

36.     For example, the Registration Statement emphasized "GoHealth's track record of significant growth in net revenues in the Medicare space in the past five years" and stated that GoHealth was expected to "continue to be one of the top choices for unbiased insurance advice to help navigate one of the most important purchasing decisions individuals make." The Registration Statement similarly stated that GoHealth had a "19-year history of consistent revenue growth and entering new market segments of insurance products," which was due to the Company's "strong customer engagement dynamics." The Registration Statement specified this purportedly strong growth rate as follows:

> Specifically, net revenues grew by 104.1% to $141.0 million for the Pro Forma First Quarter 2020 compared to $69.1 million for the three months ended March 31, 2019 and by 138.5% to $539.5 million for the Pro Forma Fiscal Year 2019 compared to $226.2 million for the year ended December 31, 2018. Adjusted EBITDA grew by 394.0% to $35.2 million for the Pro Forma First Quarter 2020 compared to $7.1 million for the three months ended March 31, 2019 and by 387.6% to $170.0 million for the Pro Forma Fiscal Year 2019 from $34.9 million for the year ended December 31, 2018.

37.     The Registration Statement particularly highlighted GoHealth's exceptional growth in the Company's Medicare segments, stating in pertinent part as follows:

> Total revenues generated in the Medicare segments grew to $124.2 million for the three months ended March 31, 2020 from $41.2 million for the three months ended March 31, 2019, representing a 201.5% increase, and to $432.7 million for the Pro Forma Fiscal Year 2019 from $112.2 million for the year ended December 31, 2018, representing a 285.7% increase. In the Medicare segments, our total Submitted Policies grew to over 132,000 Medicare policies for the three months ended March 31, 2020, as compared to over 43,200 Medicare policies the three months ended March 31, 2019 and over 427,000 Medicare policies for the year ended December 31, 2019, as compared to over 118,000 Medicare policies for the year ended December 31, 2018.

38.     The Registration Statement represented that the reasons for the increased revenues from GoHealth's Medicare segments included improved marketing strategies, increased agent

efficiencies, technological upgrades and hiring and onboarding of additional internal and external

agents. It stated in pertinent part:

> Commission Revenues
>
> Commission revenues were $112.5 million for the three months ended March 31, 2020 compared to $51.2 million for the three months ended March 31, 2019, an increase of 119.7%, which was primarily attributable to increases in commission revenues from (i) the Medicare – Internal segment of $74.4 million driven by a 291.6% increase in Medicare commissionable Approved Submissions due to the implementation of new marketing strategies to generate a greater number of prospects, an improvement in the efficiency of our agents driven by improvements in our technology, and the hiring of additional agents and (ii) the Medicare – External segment of $8.6 million driven by a 68.9% increase in Medicare commissionable Approved Submissions due to our ability to recruit and onboard additional external agencies to enroll consumers in Medicare plans using our technology and platform.

39.     The Registration Statement further stated that GoHealth was expected to continue

its rapid-fire growth as it increased market share in an expanding addressable market. The

Registration Statement stated that GoHealth had "capitalize[d]" on and was expected to continue

to capitalize on the following favorable trends: (i) "strong demographic trends, with Medicare

enrollment expected to grow from approximately 61 million individuals in 2019 to

approximately 77 million individuals by 2028"; (ii) "the increasing proportion of the Medicare-

eligible population that is choosing commercial insurance solutions, with . . . an increase of

approximately 1.5 million people from 2018 to 2019; and (iii) "an antiquated traditional field

agent driven sales process . . . ripe for disruption by digitally-enabled and technology-driven

marketplaces like our platform." The Registration Statement further claimed that "these trends

will drive a larger market in the coming years that, when taken together with our other product

and plan offerings, will result in an even larger addressable market." As a result, GoHealth was

purportedly "poised to benefit from market share gains in what has traditionally been a highly

fragmented market."

40.     Moreover, the Registration Statement highlighted the Company's data-rich proprietary technologies, which purportedly allowed it to increase consumer conversions and improved consumer engagement. According to the Registration Statement, the "differentiated value of [GoHealth's] data science-driven, fully-integrated platform has facilitated [its] rapid growth." The Registration Statement further stated in pertinent part:

> As a result of our Marketplace technology and increasingly robust data and insights, our qualified prospect to Submitted Policy conversion rate increased from 20.7% for the three months ended March 31, 2019 to 24.3% for the three months ended March 31, 2020, and from 20.6% in 2018 to 23.2% in 2019 for the multi-carrier sales outlet of the Medicare – Internal segment. An increase in the conversion rate of qualified prospects to Submitted Policies generally results in greater commissionable Approved Submissions.

41.     The Registration Statement also provided preliminary financial results for the Company's second quarter of 2020, which had closed prior to the IPO. The Registration Statement stated that GoHealth had continued its exceptional growth during this period due in part to further improved market efficiencies and consumer engagement, stating in pertinent part:

> Net revenues are expected to be between $118.0 million and $130.0 million, an increase of 66.4% at the midpoint of this range, as compared to $74.5 million for the three months ended June 30, 2019. The estimated increase in net revenues compared to the corresponding period in 2019 is primarily due to an increase in net revenues in the Medicare – Internal segment driven by higher Medicare-Internal commissionable Approved Submissions for Medicare Advantage products due to the implementation of new marketing strategies to generate a greater number of prospects, an improvement in the efficiency of our agents driven by improvements in our technology, and the hiring of additional agents.
>
> Total segment profit is expected to be between $30.0 million and $36.0 million, an increase of 65.0% at the midpoint of this range, as compared to total segment profit of $20.0 million for the three months ended June 30, 2019. The estimated increase in total segment profit compared to the corresponding period in 2019 is primarily due to the increase in Medicare-Internal commissionable Approved Submissions for Medicare Advantage products for the same reasons mentioned above.

42.     The Registration Statement characterized the Company's relationships with Humana and Anthem as a foundation for GoHealth's recent success and profitable growth. It stated in pertinent part:

> We maintain longstanding, deeply integrated relationships with leading carriers in the United States, who have some of the industry's most widely recognizable brands. For the year ended December 31, 2019 and the three month period ended March 31, 2020, the primary carriers that we served in the Medicare segments were carriers owned by Humana and Anthem, the primary carriers that we served in the IFP and Other segments were carriers owned by UnitedHealth Group. These high-quality relationships have resulted in strong carrier retention rates; since our inception, we have never had a carrier terminate for performance. We typically enter into contractual agency relationships with carriers that are non-exclusive and terminable on short notice by either party for any reason. Carriers often have the ability to terminate or amend our agreements unilaterally on short notice, including provisions in our agreements relating to our commission rates.

43.     The statements in ¶¶ 36-42 were materially false and misleading when made because they failed to disclose the following adverse facts that existed prior to and at the time of the IPO:

(i)      the Medicare insurance industry had undergone a period of elevated churn in the first half of 2020 as a result of increased competition, the growth of direct-to-consumer insurance brokers and the occurrence of a special enrollment period;

(ii)     GoHealth suffered from a higher risk of customer churn as a result of its unique business model and limited carrier base;

(iii)    GoHealth suffered from degradations in customer persistency and retention as a result of elevated industry churn, vulnerabilities that arose from the Company's concentrated carrier business model, and GoHealth's efforts to expand into new geographies, develop new carrier partnerships and worsening product mix;

(iv)     GoHealth had entered into agreements with its external sales agents that provided for a materially worse revenue sharing percentage as compared to historical

arrangements (i.e., a 90% level in 2020 versus a relatively low level in 2019), which had substantially decreased the profits that could be generated in the Company's Medicare External segment; and

(v)    these adverse financial and operational trends were internally projected by GoHealth to continue and worsen following the IPO.

44.    Defendants are strictly liable for the materially untrue and misleading statements incorporated into the Registration Statement.

**III.    Statutory Framework Applicable to the Registration Statement**

45.    The purpose of the Securities Act is "to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and, through the imposition of specified civil liabilities, to promote ethical standards of honesty and fair dealing." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195 (1976); *see also Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986); *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

46.    To effectuate this purpose, a company's registration statement must provide a full disclosure of material information. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). Failure to do so gives rise to private rights of action under the Securities Act. *Id.* at 381-82 (the Securities Act's private rights of action were "designed to assure compliance with [its] disclosure provisions . . . by imposing a stringent standard of liability on the parties who play a direct role in a registered offering.").

A.    **Section 11 of the Securities Act of 1933**

47.    Section 11 prohibits materially misleading statements or omissions in registration statements filed with the SEC.  *See* 15 U.S.C. § 77k.  Accordingly, Section 11 gives rise to liability if "any part of [a Company's] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Section 11 provides for a cause of action by the purchaser of a registered security against certain statutorily enumerated parties, including: (1) "every person who signed the registration statement;" (2) "every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of . . . the registration statement;" (3) "every person who, with his consent, is named in the registration statement as being or about to become a director;" (4) "any person . . . who has with his consent been named as having prepared or certified any part of the registration statement;" and (5) "every underwriter with respect to such security." 15 U.S.C. § 77k(a)(1-5).

B.    **Regulation S-K**

1.    **Item 303 Requirements**

48.    Item 303 imposes an affirmative duty on issuers to disclose "events" or "uncertainties" that will have a material or unfavorable impact on the registrant's future revenue. 17 C.F.R. § 229.303(a)(3)(i) & (ii); Mgmt's Discussion and Analysis of Fin. Condition and Results of Operation, Exchange Act Release No. 6835 ("S.E.C. Release No. 6835"), 1989 WL 1092885, at *4 (May 18, 1989).

49.    Specifically, Item 303 requires issuers to disclose in the registration statement any "trend, demand, commitment, event or uncertainty" that is "both presently known to management and reasonably likely to have material effects on the registrant's financial condition

or results of operations." *See* S.E.C. Release No. 6835, 1989 WL 1092885, at *4; 17 C.F.R. §

229.303(a)(3)(ii).  Pursuant to Item 303(a), for a fiscal year, a registrant has an affirmative duty

to: (i) Describe any unusual or infrequent events or transactions or any significant economic

changes that materially affected the amount of reported income from continuing operations and,

in each case, indicate the extent to which the income was so affected; and (ii) Describe any

known trends or uncertainties that have had or that the registrant reasonably expects will have a

material favorable or unfavorable impact on net sales or revenues or income from continuing

operations. If the registrant knows of events that will cause a material change in the relationship

between costs and revenues (such as known future increases in costs of labor or materials or

price increases or inventory adjustments), the change in the relationship shall be disclosed.  17

C.F.R. § 229.303(a)(3)(i)-(ii); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May

18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or

transactions that materially affected the amount of reported income from continuing

operations.") (citation and quotation omitted).

50.     Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact

of results, must be disclosed.  Examples of such required disclosures include: "[a] reduction in

the registrant's product prices; erosion in the registrant's market share; changes in insurance

coverage; or the likely non-renewal of a material contract."  S.E.C. Release No. 6835, 1989 WL

1092885, at *4.  Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in

Item 303 [as set forth above] require disclosure of forward-looking information."  *Id*. at *3.

Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the

investor an opportunity to look at the company through the eyes of management by providing

both a short and long-term analysis of the business of the company" and "a historical and

prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future." *Id*. at *3, *17. Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See Comm'n Guidance Regarding Mgmt's Discussion and Analysis of Fin. Condition and Results of Operations*, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

### 2.      Item 503 Requirements

51.      Item 503 is intended "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." *Sec. Offering Reform*, S.E.C. Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). Accordingly, Item 503 requires that offering documents "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 CFR § 229.503(c). The discussion of risk factors: must be specific to the particular company and its operations and should explain how the risk affects the company and/or the securities being offered. Generic or boilerplate discussions do not tell the investors how the risks may affect their investment. *Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers*, 1998 WL 425894, at *14 (July 29, 1998).

52.      Item 503 requires that a registration statement must disclose all known material risks that are "specific to the particular company and its operations." *Id.* Item 503(c) expressly warns issuers: "Do not present risks that could apply to any issuer or any offering." 17 CFR § 229.503(c).

53.      The undisclosed adverse facts and circumstances detailed above presented known trends, uncertainties and risks that required disclosure in the Registration Statement. Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, required the Company to disclose "any

known trends or uncertainties that have had or that [GoHealth] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105, required disclosure in the Registration Statement of "the most significant factors that ma[d]e an investment in [the IPO] speculative or risky" and an explanation of "how the risk affect[ed] [GoHealth] or the securities being offered." The Registration Statement failed to disclose material facts necessary to apprise Class A common stock purchasers of the true risks inherent in investing in the Company. Indeed, the purported risk disclosures provided in the Registration Statement, to the extent they were relevant at all, were themselves materially misleading because they failed to disclose the true facts impacting GoHealth's business, operations and financial results and/or characterized materially adverse facts that had already materialized as contingent possibilities that could impact GoHealth in the future.

54. On July 23, 2020, executives for eHealth Inc. ("eHealth") – a major GoHealth competitor – stated during an earnings call that the Medicare brokerage industry had been suffering from elevated churn during the first half of 2020. Although certain of the issues were specific to eHealth, others were not and impacted the entire industry, including GoHealth. On the call, eHealth's CEO stated that, "in the first half of this year, we saw increased levels of Medicare Advantage plan churn compared to our historic observations." He continued in pertinent part:

> On the macro side, consumers are faced with broader plan choice and multiple enrollment opportunities throughout the year, which is benefiting the broader MA [Medicare Advantage] market and increasing the market share of MA plans. At the same time, these dynamics have also led to more shopping and more switching by MA members.

55.     On August 19, 2020, GoHealth announced its financial results for the second quarter ended June 30, 2020 – the quarter immediately prior to the IPO. That same day, defendants Jones and Matthiesen hosted a conference call with analysts and investors to discuss the results. These defendants were repeatedly asked whether GoHealth was suffering from elevated churn at the time of the IPO, yet they failed to provide a direct answer. For example, when asked directly whether churn "was up or down on a like-for-like basis" by an analyst, defendant Matthiesen demurred and instead pointed investors to the Company's LTVs and cash flows.

56.     During the earnings call, defendants Jones and Matthiesen also repeatedly stated that churn was within the Company's "expectations." Furthermore, they pointed to a variety of factors that were negatively impacting the Company's churn and were expected to continue to negatively impact the Company's churn going forward, including, *inter alia*: (i) the Company's expansion into new geographies, with lower customer persistency; (ii) the Company's expansion of business with additional carriers, which presented a learning curve for the Company's agents and higher disenrollment rates; and (iii) the Company's changing product mix, such as its expansion of its Medicare Special Needs Plans business, which had a higher churn rate than Medicare Advantage plans. These Company-specific factors were in addition to the ***undisclosed*** industry-wide factors that were negatively impacting GoHealth's business leading up to the IPO. Thus, management's acknowledgement that churn matched internal "expectations" confirmed that churn was increasing as internally expected prior to and at the time of the IPO, despite the fact that this elevated churn and the ongoing negative impacts to GoHealth's business, operations and prospects had not been accurately and fulsomely disclosed to investors in the Registration Statement.

57.     GoHealth's stock price has declined significantly subsequent to the IPO. By September 15, 2020, GoHealth Class common A stock closed at just $12.53 per share – over 40% below the $21 per share price investors paid for the stock in the IPO less than two months previously.

## CLASS ALLEGATIONS

58.     **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a class of similarly situated individuals, defined as follows (the "Class"):

> All individuals or entities that purchased Class A Common stock of GoHealth pursuant and/or traceable to the Registration Statement.

The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendants' immediate families; Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parent has a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

59.     **Numerosity**: Members of the Class are so numerous that their individual joinder is impracticable.  On information and belief, members of the Class number in the thousands as millions of the Class A shares were sold in the IPO.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery provided by the Company and/or its transfer agent.  Further, the size and relatively modest value of the claims of the individual members of the Class renders joinder

impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.

60.     **Commonality and Predominance**: Common and well-defined questions of fact and law exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, which do not vary from Class member to Class member and routinely determined on a class-basis for such securities claims, and which may be determined without reference to the individual circumstances of any class member include, include but are not limited to, the following:

(a)     whether Defendants violated the 1933 Act, as alleged herein;

(b)     whether the Registration Statement misrepresented and/or omitted material information in violation of the 1933 Act;

(c)     whether and to what extent Class members have sustained damages as well as the proper measure of damages.

61.     **Adequate Representation**: Plaintiff has retained competent counsel experienced in prosecuting complex securities class actions. Plaintiff and Plaintiff's counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff and Plaintiff's counsel are able to fairly and adequately represent and protect the interests of such a Class because their interests do not conflict with the interests of the Class members Plaintiff seeks to represent. Plaintiff has raised viable statutory claims of the type reasonably expected to be raised by members of the Class, and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional Class representatives to represent the Class or additional claims as may be appropriate.

62.     **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is impracticable.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Moreover, even if every member of the Class could afford to pursue individual litigation, the Court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.  Individualized litigation would also present the potential for inconsistent or contradictory judgments, and it would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.  By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each member of the Class.  Class treatment of the issues will ensure that all claims and claimants are before this Court for consistent adjudication.  Plaintiff anticipates no difficulty in the management of this action as a class action.

### FIRST CAUSE OF ACTION
### For Violation of §11 of the 1933 Act
### (On Behalf of Plaintiff and the Class Against All Defendants)

63.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

64.     This Count is brought under §11 of the 1933 Act [15 U.S.C. §77k], on behalf of the Class, against all defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §11, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

65. The Registration Statement for the IPO contained inaccurate and misleading statements of material fact, omitted facts necessary to render statements therein not misleading, and omitted to state material facts required to be stated therein.

66. GoHealth is the registrant for the IPO. Defendants were responsible for the contents and dissemination of the Registration Statement. Each of the Individual Defendants signed or authorized the signing of the Registration Statement on his behalf. Defendant Centerbridge was the sponsor for the IPO and signed the Registration Statement through its director appointees to the Board. The Underwriter Defendants marketed and underwrote the IPO and sold the GoHealth stock issued in the IPO to plaintiff and the Class.

67. As the issuer of the shares, GoHealth is strictly liable to plaintiff and the Class for the Registration Statement's material misstatements and omissions. Signatories of the Registration Statement, and possibly other defendants, may also be strictly liable to plaintiff and the Class for such material misstatements and omissions. None of the defendants made a reasonable investigation or possessed reasonable grounds to believe that the statements in the Registration Statement were complete, accurate or non-misleading.

68. By reason of the conduct alleged herein, defendants violated §11 of the 1933 Act. Plaintiff and Class members purchased GoHealth Class A common stock pursuant and/or traceable to the Registration Statement and have sustained damages as a result. The value of the stock has declined substantially subsequent and due to defendants' violations. At the time of their purchases, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.

69. Less than one year has elapsed from the time that plaintiff discovered, or reasonably could have discovered, the facts upon which these claims are based to the time that

plaintiff filed this action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this action.

**SECOND CAUSE OF ACTION**
**For Violation of §15 of the 1933 Act**
**(On Behalf of Plaintiff and the Class Against Defendants GoHealth, Centerbridge, NVX Holdings, and the Individual Defendants)**

70.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

71.     This Count is brought under §15 of the 1933 Act [15 U.S.C. §77o], against defendants GoHealth, Centerbridge, NVX Holdings and the Individual Defendants. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of §15, and any implication of fraud or fraudulent intent is hereby expressly disclaimed.

72.     As detailed herein, each of defendants committed primary violations of the 1933 Act by engaging in conduct in contravention of §§11 of the 1933 Act.

73.     The Individual Defendants were each control persons of GoHealth by virtue of their positions as directors, senior officers and/or significant shareholders of the Company. They each had direct and/or indirect business and/or personal relationships with other directors, officers and/or major shareholders of the Company. The Company also controlled the Individual Defendants, given the influence and control the Company possessed and exerted over the Individual Defendants and all of its employees. Centerbridge, the owner of the Company and the private equity sponsor of the IPO, controlled the Company and its Board appointees.

74.     Defendants Cruz, Jones and Centerbridge took additional steps to cement their control over the Company and its affairs. For example, these defendants created a dual class voting structure and caused the Company to enter into a variety of shareholder agreements to ensure that public investors would effectively have no say over the management of GoHealth and that the Company would not be subject to independent oversight. Following the IPO,

25

defendant Centerbridge and defendants Cruz and Jones (through their ownership and control over defendant NVX Holdings) in combination possessed over 68% of the voting power of the Company as a result of their ownership of Class A and Class B shares. Because Class B shares entitled their holders to an additional one vote per share, these defendants possessed majority voting control over the Company out of proportion with their economic stake. In addition, pursuant to a stockholders agreement, defendant Centerbridge and defendants Cruz and Jones were collectively entitled to nominate up to eight members of the Board and had signed an agreement amongst each other requiring them to support each other's nominations, allowing these defendants to dominate the Board and its actions. These defendants also entered into various agreements in connection with the Acquisition and the IPO that allowed them to funnel millions of dollars from the IPO proceeds and GoHealth's revenues into their own pockets and the pockets of their affiliates.

75.     By reason of the conduct alleged herein, these defendants violated §15 of the 1933 Act, and plaintiff and the Class have suffered harm as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of themselves and the proposed Class, respectfully requests that this Court enter an Order:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as representative of the Class, and appointing counsel as Class Counsel;

B.     Awarding Plaintiff and the Class compensatory damages against all Defendants jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to proven at trial;

C.    Awarding Plaintiff and the Class reasonable litigation expenses and attorneys'

fees;

D.    Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent

allowable; and

E.    Awarding such other and further relief as equity and justice may require.

## JURY TRIAL

Plaintiffs demand a trial by jury for all issues so triable.

Dated:  September 28, 2020                    Respectfully submitted,

                                              /s/    *Carl V. Malmstrom*
                                              **WOLF HALDENSTEIN ADLER**
                                              **  FREEMAN & HERZ LLC**
                                              Carl V. Malmstrom
                                              111 W. Jackson Blvd., Suite 1700
                                              Chicago, IL 60604
                                              Tel:  (312) 984-0000
                                              E-mail:  malmstrom@whafh.com

                                              **WOLF HALDENSTEIN ADLER**
                                              **  FREEMAN & HERZ LLP**
                                              Matthew M. Guiney (*pro hac vice* forthcoming)
                                              Kevin G. Cooper (*pro hac vice* forthcoming)
                                              270 Madison Ave., 9th Floor
                                              New York, NY 10016
                                              Tel:  (212) 545-4600
                                              E-mail:  guiney@whafh.com
                                                       kcooper@whafh.com

                                              ***Counsel for Plaintiff and the Putative Class***